Caldwell, J.
This is a bill filed by the creditors of Matthias- • Kugler, the principal object of which is to set aside certain conveyances made by him to his children in March, 1847. At the time of these conveyances, Matthias Kugler was possessed of property (according to the estimate of the master to whom this ease was referred) of the value of $176,540.65, and was indebted to the amount of $98,327.86. About $146,000 of the property consisted of real estate—on which were several mills and distilleries. On the 13th of March, 1847, Matthias Kugler conveyed to different members of his family what in the aggregate amounted to $105,674.74. On the property thus conveyed, over $40,000 of Kugler’s indebted *327 ness was secured by mortgage—the grantees took the property subject to the liquidation of these incumbrances. Schultz and Kugler, two of the grantees, also executed a mortgage to Matthias Kugler, Sen., to secure the payment of about $15,000 more of the ♦indebtedness. The amount of Bugler’s indebtedness intended to be secured by this family arrangement amounted to about $55,800. The amount of Bugler’s indebtedness left wholly unprovided for by the arrangement, is stated by the master in the alternative; upon one hypothesis, it amounts to $42,599.55, and on the other to $47,190.05.
The master estimates the property retained by Bugler, at the time of the conveyance to his family, at $70,837.93 ; the real estate he values at $51,152, and the personalty at $19,685.93. This estimate, the master reports, is made by setting down to Bugler’s sole account several tracts of land that had been convoyed to Kugler and wife, and stood in their names, and the half of which, it is contended, belonged to Mrs. Bugler’s heirs. Deducting the one-half of the value of the property thus situated, the real estate retained by Bugler would amount, according to the master’s estimate, to $28,376, and the entire assets, real and personal, retained, to $48,061.93. This latter the court regard as the true estimate. The property in the joint names of Kugler and wife, was the property that formerly belonged to Mrs. Bugler’s father, Christian Waldsmith. On the death of Christian Waldsmith, Mrs. Kugler, as heiress, became entitled to one-seventh. A petition was filed by some of the heirs for partition; Kugler and wife elected to take the property, and the sheriff conveyed it to them jointly, on Kugler giving bond to pay the other heirs. Although Kugler may have considered this property as his, and liable to the payment of his debts, yet Mrs. Kugler had the legal title to the one-half by the conveyance, and was the owner of one-seventh previous to that time. The title had remained in their joint names since 1817,and wo think the one-half of the property belonged to Mrs. Kugler, and at her death descended to her heirs, and could ip. no way be liable for Bugler’s debts. Bugler continued, after the conveyances, to carry on an extensive business, until some time in, 1849, when ho failed; his mill and distillery were destroyed by fire, and he became largely insolvent.
♦It is said, on the part of the complainants, that these conveyances were fraudulent, as to the creditors of Matthias Kugler.
*328 The first question that we propose to consider, is whether there was any actual fraud intended by Kugler in thus disposing of his property.
Wherever a person, largely indebted, gives away a large amount of bis property, without amply providing for the payment of his debts, a suspicion of fraud will generally attach to the transaction. There are, however, connected with this case many circumstances going to rebut any suspicion that fraud was intended. Kugler was engaged at the time in a very extensive business; the arrangement does not appear to have been made with any intention of stopping business, although the conveyance of this property necessarily curtailed his operations; for two years after, however, he continued to operate extensively.
From the number and amount of his debts that he afterward contracted, it would appear that he still had credit, and must have been regarded as a responsible man.
After the conveyance, he commenced paying off his indebtedness that existed at that time, and although the evidence does not furnish us with any certain data on the subject, yet it appears that he succeeded in paying off the principal part of that indebtedness. The most of the debts that he now owes are such as were contracted after the conveyance, or such as were secured by it. It was very natural, considering the advanced age of Matthias Kugler, that he should find it necessary to contract his business. His sons and sons-in-law had been doing business for him at his different milling and distillery establishments. By making the conveyances as he did, he could free himself from a large portion of his indebtedness, establish several members of his family in business on their own account, and free himself from the harassing care of such an extensive and complicated business. He acted as if he intended to retain the property reserved; he says in his answer, that he intended the Germany property at his death for his son *Jacob ; his conduct accords with this statement; no conveyance is made to Jacob, and he enters into partnership with him.
It may be said, however, that Matthias Kugler gave away too much of his property, considering the amount of his indebtedness. In reference to this, we would say, in the first place, that from the manner in which Mr. Kugler obtained and used the property, and treated it, that he made no distinction between that which stood in the names of himself and wife jointly, and his other property, and *329 regarded it as liable to the payment of his debts; which opinion, .although erroneous, would load him to believe that he had retained for the payment of his debts more than twenty thousand dollars’ worth of property, above what he really had. But, supposing we are mistaken in this supposition, still the amount of property retained that absolutely belonged to Matthias Kugler is valued at more than all his indebtedness. A part of this property consisted of a mill and distillery which Kugler had been carrying on for many years; if his business in future should be profitable, ho would be able to pay his debts, and he no. doubt continued it in the expectation that it would be so. Kugler’s conduct and business transactions, after these conveyances were made, show that they were not made with any intention of suspending business; on the contrary, they show that his business, although disastrously, was vigorously pursued, and he only suspended when he was compelled to do so. We think from the whole facts in the case, that although, as future events proved, this family arrangement was improvidently made, yet that no actual fraud was intended at the time it was consummated, on the creditors of M. Kugler. Nor is there any circumstance to induce the belief that any fraud was intended as to subsequent creditors.
But, although we do not think that any fraud was intended by the parties to these conveyances, the question still remains, whether they operated to the prejudice of creditors.
These several conveyances must be considered in the light of gifts. It is true, that part consideration was received in *most of the eases; yet we think that does not change the character of the transaction. Although other motives no doubt induced the arrangement, yet the ruling object was to make an advancement to the several grantees. Now, a man largely indebted, as Kugler was, can not make a gift of his property without the most careful regard to the rights of his creditors. And such gift is never upheld, unless property, clearly and beyond doubt, is retained sufficient to pay all the donor’s debts. See King’s Heirs v. Thompson and wife, 9 Peters, 220; Salmon v. Bennett, 1 Conn. 543; Jackson v. Peck, 4 Wend. 303; Hinde v. Longworth, 11 Wheaton, 199; Seward v. Jackson, 8 Cow.; Jackson v. Form, 4 Con. 604; Gale v. Williamson, 8 Mees. & Welsby, 409; Seward v. Vanwyck, 1 Edw. Ch. 334; Brackett v. Waite, 4 Vt. 389; Usher v. Hazletine, 5 Greenl. 474; Chambers v. Spencer, 5 Watts, 404; Morteer v. Hissim, 3 Penn. *330 165; Wallace, 108; Lessee of Burget v. Burget, 1 Ohio, 482; Brice v. Meyers, 5 Ohio, 124; Lessee of Douglass v. Dunlap, 10 Ohio, 162; Miller v. Wilson, 15 Ohio, 114; Tremper v. Barton, 18 Ohio, 423; Creed v. Lancaster Bank, 1 Ohio St. 1.
Now, how was it in this case ? The property retained by Kugler, liable to the payment of his debts, amounted to about $48,000. His debts, at the lowest calculation, amounted to $42,000, and they probably amounted to $47,000. ' But taking the amount of indebtedness at the lowest estimate, $42,000, and experience teaches us that, owing to the expenses incident to the sale, and the sacrifice almost universally attending forced sales, the amount of property reserved would not have paid the debts, if subjected to that purpose. Kugler, then, not having reserved property clearly ample to pay his debts, was not in a situation to make the gifts good, and the conveyances, as to all debts in existence at the time of their execution, must be held as of no effect.
The next question that arises in the case is, whether the conveyances not being good as to the prior creditors, the subsequent creditors can avail themselves of that objection?
*Now, we have previously determined, that these conveyances were made without any intentional fraud as to either prior or subsequent creditors. If Kugler had not been in debt, ho would have had a perfect right to distribute, his property amongst his children; no person could have objected. No policy of law, or principle of justice, would have been violated; his gift of his property would have been as valid as a sale. It is only because that, being in debt, he is bound in good faith to have a regard, in the disposition of his property, to the just. claims of his creditors—to regard the obligation which he has incurred to them—that any objection can be made to the transaction. This principle does not apply at all to the subsequent creditors; they give credit to their debtor as he is—for what he has, not for what he once had. We must then regard the conveyances', as to subsequent creditors, and all persons other than the creditors, then occupying that relation, as good. See United States Bank v. Housman, 6 Paige Ch. 535; Saxton v. Wheat. 8 Wheat. 229; Hinde v. Longworth, 11 Wheat. 199; Parker v. Proctor et al., 9 Mass. 374; 4 Wash. C. C. 137; Lush v. Wilkinson, 5 Vesey, Jr. 387; 9 Peters 220; 12 Vesey, Jr. 155.
An objection has been taken to the acknowledgment of these deeds. They were acknowledged before a justice of the peace of *331 Clermont county, in the county of Hamilton. It is alleged that under our statute, which, in express terms, gives to justices of the-peace the right to take acknowledgment of deeds, throughout their county, their jurisdiction in taking acknowledgments is limited to the county in which they reside, and consequently these acknowledgments are void.
If this wore an open question, it certainly would be one of difficulty ; but we do not see that the question here presented differs in principle from the cases of Moore v. Vance, 1 Ohio, and the Lessee of Kisman v. Loomis, 11 Ohio.
The judges of the territory were authorized to do official acts only within the territory for which they were appointed; and in the cases referred to, the court held that *they were empowered to take the acknowledgment of deeds by persons residing anywhere within the United States, for the conveyance of any lands within the territory. In this respect their powers were not more extensive than those of justices of the peace, under existing laws; and we can see no distinction between the exercise of these powers, in the case of justices of the peace without their county, but within the state, and the exercise of the same powers hy the territorial judges without their territory. Whatever douhts might have existed, as to the correctness of these decisions originally, they have stood as the law of the state for many years, and until the doctrine has become a. rule of property, which ought not to be disturbed.

Decree for complainants.